UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| THERMOLIFE INTERNATIONAL LLC and RON KRAMER,<br><br>Plaintiffs,<br><br>v.<br><br>ANTHONY CONNORS and JANE DOE CONNORS,<br><br>Defendants. | Civ. No. 2:13-4399 (KM)<br><br>MEMORANDUM OPINION |

**KEVIN MCNULTY, U.S.D.J.:**

This matter comes before the Court on the unopposed motion of Plaintiffs ThermoLife International, LLC ("ThermoLife") and Ron Kramer, for Default Judgment against Defendant Anthony Connors (Docket No. 7), pursuant to Fed. R. Civ. P. 55(b)(2). I have requested supplemental briefing and documentation in support of the relief requested. Again, Defendants have not responded. For the reasons set forth below, I find that default judgment is appropriate. I also grant Plaintiffs' request for injunctive relief and will award compensatory damages.

# I. BACKGROUND

Ron Kramer is the President and Chief Executive Officer of ThermoLife International, LLC, which is organized under Arizona law. The company's principal place of business is in Arizona. Docket No. 1 ("Compl.") at 2. ThermoLife is a manufacturer in the sports nutrition and supplement industry. Anthony Connors[1] is a resident of New Jersey. *Id.*

On July 19, 2013, ThermoLife and Kramer filed a three-count complaint, alleging claims of Defamation, Tortious Interference with Present and Prospective Business Relations, and Tortious Interference with a Contract. Compl. at 10-13. Plaintiffs requested judgment in their favor awarding

---

[1] According to Plaintiffs, Anthony Connors is also known as Anthony Roberts. Compl. at 2; Docket No. 7 at 1.

1

compensatory damages and injunctive relief. Compl. at 13–14. The gist of the complaint is that Connors[2] has continually made false statements online about Kramer and his business. These, according to the complaint, included disparagement of a pending patent and lies about Kramer's involvement in a steroid scandal. These statements are alleged to have damaged business relations and caused Kramer to lose business and goodwill in his industry.

Defendant Anthony Connors was served with the complaint, summons, and exhibits on August 10, 2013. Docket No. 5. An affidavit of service, filed August 14, 2013, states that the complaint, summons, and exhibits were left at the Defendant's home with his mother, Jill Connors, after two previous attempts to personally serve the Defendant. *Id.* Pursuant to Fed. R. Civ. P. 12(a)(1), Defendant had twenty-one days to respond to the Complaint; the time to respond expired on September 3, 2013.

Defendant has failed to answer or otherwise respond to the complaint. On September 4, 2013, Plaintiffs requested that the Clerk enter default pursuant to Fed. R. Civ. P. 55(a). On September 5, 2013, the Clerk entered default against Connors. On December 2, 2013, Plaintiffs filed a Motion for Default Judgment as to Connors. Docket No. 7.

In an abundance of caution, on January 2, 2014, I issued an Order to Show Cause why the Court should not enter default judgment in Plaintiffs' favor (Docket No. 10). I also requested that Plaintiffs submit proof of damages, in the form of documentary evidence and affidavits. All papers in support and in opposition were to be submitted on or before January 22, 2014, and were ordered to be personally served. Plaintiffs timely filed supplemental briefing and accompanying exhibits in support of their Motion for Default Judgment, Docket No. 11. Defendant did not respond and has not otherwise appeared.

## II. DISCUSSION

### A. Entry of Default Judgment

"[T]he entry of a default judgment is left primarily to the discretion of the district court." *Hritz v. Woma Corp.*, 732 F.2d 1178, 1180 (3d Cir. 1984) (citing

---

[2] A "Jane Doe Connors" is also named as a defendant, solely by virtue of her status as the spouse of Anthony Connors. For simplicity, I will disregard "Jane Doe" and refer to Anthony Connors as Defendant or Connors.

2

*Tozer v. Charles A. Krause Milling Co.*, 189 F.2d 242, 244 (3d Cir.1951)). Because the entry of a default judgment prevents the resolution of claims on the merits, "this court does not favor entry of defaults and default judgments." *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 194 (3d Cir. 1984). Thus, before entering default judgment, the Court must determine whether the "unchallenged facts constitute a legitimate cause of action" so that default judgment would be permissible. *DirecTV, Inc. v. Asher*, 03-cv-1969, 2006 WL 680533, at *1 (D.N.J. Mar.14, 2006) (citing Wright, Miller, Kane, 10A Federal Practice and Procedure: Civil 3d § 2688, at 58–59, 63).

"[D]efendants are deemed to have admitted the factual allegations of the Complaint by virtue of their default, except those factual allegations related to the amount of damages." *Doe v. Simone*, CIV.A. 12-5825, 2013 WL 3772532, at *2 (D.N.J. July 17, 2013). While "courts must accept the plaintiff's well-pleaded factual allegations as true," they "need not accept the plaintiff's factual allegations regarding damages as true." *Id.* (citing *Chanel, Inc. v. Gordashevsky*, 558 F.Supp.2d 532, 536 (D.N.J. 2008). Moreover, if a court finds evidentiary support to be lacking, it may order or permit a plaintiff seeking default judgment to provide additional evidence in support of the allegations. *Doe*, 2013 WL 3772532, at * 2.

Before a Court may enter default judgment against a defendant, the summons and complaint must have been properly served, and the defendant must have failed to file an answer or otherwise respond to the complaint within the time frame provided by the Federal Rules, which is twenty-one days. *See Gold Kist, Inc. v. Laurinburg Oil Co., Inc.*, 756 F.2d 14, 18–19 (3d Cir. 1985); Fed. R. Civ. P. 12(a). Here, Defendant Connors was properly served and has failed to respond to the complaint. He also has failed to respond to the Court's Order to Show Cause why default judgment should not be entered in Plaintiffs' favor. And he failed to respond to Plaintiffs' supplementary proofs of damages. I am satisfied that the prerequisites to filing default judgment are met. *See Gold Kist, Inc.*, 756 F.2d at 18–19.

I must now evaluate the following three factors: (1) whether the party subject to default has a meritorious defense, (2) the prejudice suffered by the party seeking default, and (3) the culpability of the party subject to default. *Doug Brady, Inc. v. N.J. Bldg. Laborers Statewide Funds*, 250 F.R.D. 171, 177 (D.N.J. 2008) (citing *Emcasco Ins. Co. v. Sambrick*, 834 F.2d 71, 74 (3d Cir.1987)). Those factors, considered in light of the record of this case, weigh in favor of entry of a default judgment.

As to the first factor, I am disadvantaged, of course, by the lack of any submission by defendant Connors. My independent review of the limited record before me, however, reveals no suggestion that Plaintiff's claims are legally flawed or that there is a meritorious defense to them. *See Doe*, 2013 WL 3772532, at * 5. Accepting the factual allegations as true, I readily find that Plaintiffs have stated claims for Defamation, Tortious Interference with Present and Prospective Business Relations, and Tortious Interference with a Contract.

As for the first count, under New Jersey law, "a statement is defamatory if it is (1) false, (2) communicated to a third person, and (3) tends to lower the subject's reputation in the estimation of the community or to deter third persons from associating with him." *W.J.A. v. D.A.*, 210 N.J. 229, 238, 42 A.3d 1148, 1153 (2012) (quoting *Lynch v. N.J. Educ. Ass'n*, 161 N.J. 152, 164–65, 735 A.2d 1129 (1999)). The complaint details the false statements disseminated on the internet by Connors to the detriment of Kramer and Kramer's business, ThermoLife. Essentially, Connors allegedly disparaged Thermolife's patent (or pending patent) and accused Kramer of blackmail, setting up friends for prosecution, and being the informant in the BALCO sports steroid scandal. *See* Compl. ¶¶ 29–31, 36, 37–48. Assuming Plaintiffs' factual allegations are true, *see Chanel*, Inc., 558 F. Supp. 2d at 535, I find that they would state a claim for defamation under New Jersey law.

As for the second count, "[a]n action for tortious interference with a prospective business relation protects the right to pursue one's business, calling, or occupation, free from undue influence or molestation." *Lamorte Burns & Co., Inc. v. Walters*, 167 N.J. 285, 305, 770 A.2d 1158, 1170 (2001) (citation omitted). A plaintiff must demonstrate that the interference was malicious—*i.e.*, "that harm was inflicted intentionally and without justification or excuse." *Id.* at 306, 1171 (citing *Ideal Dairy Farms, Inc. v. Farmland Dairy Farms, Inc.*, 282 N.J. Super. 140, 199, 659 A.2d 904, 933 (App. Div. 1995)). The complaint alleges that ThermoLife and Kramer had business relationships and prospective relationships at the time Connors posted defamatory statements online. Connors "contacted ThermoLife's customers directly via registered mail to falsely inform them" that a patent application had been denied, that the patent would not issue, and that customers could no longer sell Thermolife's products with the "patent pending" label. The unanswered Complaint alleges, and it is reasonable to infer, that Connors was familiar with Thermolife's business and business relationships. Compl. ¶¶ 66, 67, 69. These factual allegations, accepted as true, plausibly state a claim for tortious interference with present and prospective business relations.

4

As for the third count, the elements of a claim for tortious interference with a contractual relationship are (a) the existence of a contract, (b) intentional interference, with malice, (c) loss of the contract, and (d) damages. *Velop, Inc. v. Kaplan*, 301 N.J. Super. 32, 49, 693 A.2d 917, 926 (N.J. Super. Ct. App. Div. 1997) (citing *Printing Mart-Morristown v. Sharp Electronics*, 116 N.J. 739, 563 A.2d 31 (N.J. 1989)). The complaint alleges that "Connors maliciously and falsely posted that the '029 patent application would be denied, and a leading supplement manufacturer, BSN, terminated its relationship with ThermoLife based on Connors reaching out to BSN directly and telling then that the patent would not issue, even though the patent ultimately issued." Compl. ¶¶ 30–36. These allegations set forth a legally sufficient claim of tortious interference. I cannot find, without more, that Connors has an ascertainable meritorious defense.

Second, Plaintiffs would suffer prejudice if a default judgment were denied. As Plaintiffs argue, they have "no other remedy against Defendant." Docket No. 7 at 3 (citing *Doe*, 2013 WL 3772532, at * 5). Defendant was properly served over seven months ago, yet failed to appear or defend himself in any manner. *See Teamsters Pension Fund of Philadelphia & Vicinity v. Am. Helper, Inc.*, CIV. 11-624 JBS/JS, 2011 WL 4729023, at *4 (D.N.J. Oct. 5, 2011). Given Defendant's past, and allegedly ongoing, tortious behavior, I find that Plaintiffs would suffer prejudice if default were denied. It would be inequitable to allow Defendant to preclude relief by simply failing to appear.

Third, absent any evidence to the contrary, I will infer that the default was culpable. "[T]he Defendant's failure to answer evinces the Defendant's culpability in its default. There is nothing before the Court to show that the Defendant's failure to file an answer was not willfully negligent." *Teamsters Pension Fund of Philadelphia & Vicinity*, 2011 WL 4729023, at *4 (citing *Prudential Ins. Co. of America v. Taylor*, No. 08-2108, 2009 WL 536403 at *1 (D.N.J. February 27, 2009) (finding that when there is nothing before the court to suggest anything other than the defendant's willful negligence caused the defendant to fail to file an answer, the defendant's conduct is culpable and warrants default judgment). Defendant was served with the complaint back in August of 2013. By Order to Show Cause, he has been afforded an additional opportunity to respond. Defendant has not responded or otherwise offered any justification for his default or for the underlying conduct detailed in the Complaint. There is no conclusion to draw but that he is culpable for this failure.

Accordingly, I find that the entry of a default judgment is appropriate.

B. Remedies

Pursuant to this Court's Order to Show Cause, Docket No. 10, Plaintiffs have submitted supplemental briefing, an affidavit, and other papers in support of their request for damages and injunctive relief. Docket No. 11. The Defendant has submitted nothing. I have therefore determined that an *ex parte* "evidentiary hearing" would serve little additional purpose, and will rule based on the record before me.

i. Injunctive Relief

Plaintiffs request injunctive relief in order to prevent Connors from continuing to defame Plaintiffs on the internet. Plaintiffs argue that entry of injunctive relief is of particular importance because Connors has continued to cause irreparable harm to Kramer and ThermoLife by posting false and defamatory statements in the form of online articles and blog posts.

The Supreme Court requires that any plaintiff seeking a permanent injunction to show:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*eBay, Inc. v. MercExchange*, LLC, 547 U.S. 388, 391 (2006) (citations omitted). The Court may issue a permanent injunction in the context of a default judgment where these requirements are met. *See Coach, Inc. v. Ocean Point Gifts*, CIV.A.09-4215 JBS, 2010 WL 2521444, at 10 (D.N.J. June 14, 2010); *see also Chambers v. Scutieri*, A-4831-10T1, 2013 WL 1337935, at 14 (N.J. Super. Ct. App. Div. Apr. 4, 2013) ("Plainly, a party who is the victim of defamation is entitled to an effective remedy. To ensure this occurs, we conclude that a trial court must have the ability to issue a permanent injunction to protect the individual's good name and dignity in an appropriate case.") (internal quotations and citation omitted).

Here, Plaintiffs allege that they have suffered an ongoing injury to their business reputation that is attributable to the continual tortious acts of Connors, and that no remedy at law is sufficient to stop this behavior. I am satisfied that the defamatory statements and tortious interference are ongoing or likely to be repeated. It appears from Plaintiffs' submissions that Defendant has continued to engage in an online campaign to damage Plaintiffs' reputation in the supplement industry. In the supplemental briefing, Plaintiffs note that Defendant's "obsession with Plaintiffs has continued while this lawsuit is pending." Docket No. 11-1 at 4. Plaintiffs describe Connors' website as "little more than a smear page that is almost exclusively devoted to attacking Plaintiffs." *Id.* at 5.

There has been post-litigation activity on Defendant's web site. In a December 21, 2013 online post, the Defendant stated that "Kramer has been caught dealing steroids more than once" and that ThermoLife continues to "sell a product the FDA told them not to market . . . ." Docket No. 11-2 at 14, Exhibit 3. The post alleged that a journalist working for the *USA Today* who wrote a series on the supplement industry for the newspaper failed to address ThermoLife and Kramer's alleged malfeasance because she was protecting Kramer. In the post, Defendant stated that he would "defy anyone to go through her work in the field and produce a single subject of her investigations who has an equivalent criminal history; even cumulatively her subjects fail to rival the criminal history of the man [*i.e.*, Kramer] she is protection." Another post dated November 23, 2013, discusses Kramer's alleged criminal history and asserts that Plaintiffs have ignored the FDA by continuing to sell unsafe products. *Id.* at 22-25. Defendant posted about Plaintiffs on November 30, 2013. *Id.* at 28. I do not rule specifically on the truth, or not, of these more recent postings. I do consider them as evidence of the ongoing, indeed rather dogged, character of Defendant's acts.

Compensatory damages may provide relief, but will not relieve Plaintiffs from the potential for future harm. *See Coach, Inc.*, 2010 WL 2521444, at *9. Injunctive relief is particularly appropriate where the defendant has shown no inclination to discontinue an ongoing course of tortious activity (and may be judgment-proof to boot).[3] A plaintiff subject to continual defamation or tortious

---

[3] Plaintiffs argue that entry of injunctive relief is of critical importance here because Connors is judgment-proof and continues to post false and defamatory

interference with his business is not necessarily required to endure it and continually supplement his claims for damages; he is entitled to have the activity stopped.

In balancing the hardships, I find that equity warrants the relief Plaintiffs seek. The only "hardship" imposed upon Connors is that he refrain from engaging in tortious conduct. *Id.*

Finally, I find that the public interest would not be disserved by issuing an injunction. I am sensitive to the First Amendment concern that the truth have breathing space, and that some false statements must therefore be tolerated in a free society. Here, however, Plaintiffs have made a persuasive showing that the statements in question are false, and hence of little value. Connors, for his part, has not even attempted to defend them. I nevertheless consider the potential negative consequences of enjoining future statements.

The traditional view, borrowed from the common law, is that equity lacks the power to enjoin defamation. That proscription, however, is neither unbounded nor universally recognized. *See Kramer v. Thompson*, 947 F.2d 666, 670 & n.12 (3d Cir. 1991). In *Tory v. Cochran*, the Supreme Court did not deem an injunction against defamatory speech impermissible per se, but instead found that the injunction "could no longer achieve the objectives that the trial court had in mind [and] the grounds for the injunction [were] much diminished, if they have not disappeared altogether." 544 U.S. 734 at 737–38 (2005). Consequently, the Court held, "the injunction, as written," amounted "to an overly broad prior restraint upon speech, lacking plausible justification." *Id.* To be sure, "prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976). Generally, injunctions restricting speech may burden only as much speech as is "necessary to serve a significant government interest." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). Therefore, a court is not prohibited from entering such an order, but must narrowly it so as to avoid imposing an "overly broad prior restraint" without "plausible justification." *Tory*, 544 U.S. at 737–38; *see also Aoki v. Benihana, Inc.*, 839 F. Supp. 2d 759, 767 (D. Del. 2012) (reasoning that while a defendant in a defamation action "may consider plaintiffs' prayer for injunctive relief as being broad, the exact contours of any such relief will

---

statements regarding Kramer and ThermoLife online. They argue that an injunction may be the only way to stop Connors from causing further harm. Docket No. 7 at 5.

8

depend, first, on plaintiffs prevailing on their claims and, second, on the evidence of record").

The United States Court of Appeals for the Third Circuit, in *Kramer, supra,* setting aside the First Amendment and confining itself to state law, predicted that the Pennsylvania Supreme Court would continue to hew to the old rule against enjoining defamation. In doing so, *Kramer* usefully summarized four rationales for that traditional rule: (1) that equity protects property, not personal, rights; (2) that judge-fashioned equitable relief might subvert the role of the jury; (3) that damages are an adequate remedy; and (4) the First Amendment proscription of prior restraints. 947 F.2d at 671-72. *See* David S. Ardia, *Freedom of Speech, Defamation, and Injunctions*, 55 Wm. & Mary L. Rev. 1 (2013), available at http://scholarship.law.wm.edu/wmlr/vol55/iss1/2 (surveying case law).

I have considered the federal authorities cited above, and, following *Kramer's* lead, I also look to state law for guidance. New Jersey law is sparse, but it suggests that there is no absolute prohibition. In *Chambers v. Scutieri*, the Appellate Division of the Superior Court of New Jersey rejected the defendant's contention that "equity cannot enjoin defamation." *Chambers* held "that where the trial court has conducted a trial and has concluded the defendant's statements were defamatory, the court may consider the issuance of a permanent injunction to prevent the defendant from continuing his or her course of conduct in the future." *Chambers*, 2013 WL 1337935, at *14 (N.J. Super. Ct. App. Div. Apr. 4, 2013).

Here, the Court is faced with the challenge of providing relief to Plaintiffs that is not overbroad and does not unduly burden First Amendment rights. Such an injunction is permissible, in my view, for several reasons related to the four rationales enumerated in *Kramer*:

- First, at issue is not just defamation, a personal tort, but statements made for the purpose of interfering with the plaintiff's property rights in his business.

- Second, there is little reason to fear subversion of the right to a jury determination when a defendant has defaulted and waived that right.

9

- Third, damages may remedy past misconduct, but Defendant has ignored this lawsuit and appears poised to continue his actions.

- Fourth, I will tailor the relief to minimize any possible interference with legitimate First Amendment rights by enjoining only the further dissemination of statements alleged in the Complaint and admitted to be false by virtue of the default. Thus, for example, in *Lothschuetz v. Carpenter*, the plaintiffs appealed a district court's refusal, on First Amendment grounds, to award injunctive relief after entering a default judgment on a claim of libel. 898 F.2d 1200 (6th Cir. 1990). The Sixth Circuit reversed and remanded to the district court to enter a "narrow and limited injunction" prohibiting the defendants "from continuing and reiterating the same libelous and defamatory charges." *Id.* at 1208 (Wellford, J., for the court, concurring in part, dissenting in part). Viewed another way, Defendant's default here may be viewed as Defendant's consent to the relief, at least to the extent that the relief is closely tied to matters specifically alleged in the Complaint. *See* Ardia, *Freedom of Speech*, 55 Wm. & Mary L. Rev. at 56-57, 65-68 (surveying case law and concluding that, even as to pure defamation claim, a "Type IV" injunction directed against specific statements adjudged to be defamatory is not overbroad).

Plaintiffs have requested an injunction prohibiting any further false statements concerning Plaintiffs' products or Ron Kramer's background. I have not granted that request, which is too broad. Rather, I will enjoin only the further dissemination of false statements of the kind admitted by Defendant's failure to answer the Complaint.

Defendant and his officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with him, are hereby enjoined from:

1. Making any statement on the internet that falsely disparages ThermoLife International LLC's U.S. Patent Application No. 10/904,029 (the "Dicana Patent Application") (issued as U.S. Patent No. 7,919,533), and the assertion by ThermoLife (or any company related to ThermoLife International, LLC) of patent protections related to U.S. Patent Application No. 10/904,029 (issued as U.S. Patent No. 7,919,533); and

2. Making any false statement on the internet to the effect that Ron Kramer was the source or informant that led to the Bay Area Labs Co-Operative ("BALCO") investigation.

I will, however, retain jurisdiction to enforce this injunction, and I will modify it upon a showing that the defamation or tortious interference has continued under some other guise.

### ii. Damages

Plaintiffs request that the Court enter a judgment awarding them damages in the amount of $2,440,000.00, plus punitive damages in the same amount. Docket No. 11-1 at 2. Plaintiffs allege that Connors' "continued false statements about ThermoLife, its products, and its President [Kramer], Defendant [have] caused ThermoLife and Kramer monetary and reputational damages." *Id.* at 3. Damages are, of course, available as a remedy in either a defamation or tortious interference case.[4]

First, Plaintiffs seek damages for the disparagement of ThermoLife's Dicana Patent Application and contracts concerning that patent. According to Plaintiffs, in at least four separate posts appearing on the internet, Defendant falsely asserted that the patent would not issue. Defendants also falsely accused ThermoLife of engaging in improper business practice by seeking patent protection for a patent it knew would not receive patent protection. Defendant also contacted BSN, to whom ThermoLife sold the product embodied by the Dicana Patent Application under the "patent pending" label, falsely informing BSN that the patent would not issue and that ThermoLife had improperly sold the product under the "patent pending" label. Plaintiff's supplemental materials state that, as a direct result of Defendant's actions,

---

[4] *See, e.g.,* Restatement (Second) of Torts § 621 (1977) ("One who is liable for a defamatory communication is liable for the proved, actual harm caused to the reputation of the person defamed.").Comment (a) provides:

> At common law general damages have traditionally been awarded not only for harm to reputation that is proved to have occurred, but also, in the absence of this proof, for harm to reputation that would normally be assumed to flow from a defamatory publication of the nature involved. This presumption of general damage to reputation from a defamatory publication that is actionable per se affords little control by the court over the jury in assessing the amount of damages.

BSN terminated its relationship with ThermoLife. Docket No. 11-2, Exhibit 4 ("Decl. of Ron Kramer") ¶¶ 7, 11.

At the time, BSN was paying ThermoLife $360,000.00 a year on a supply contract, which netted a profit of $240,000.00 a year. *Id.* ¶ 8. Kramer asserts that this contract would "likely" have continued for another three years, resulting in a total loss of at least $720,000.00 in damages. *Id.* Kramer does not attach a copy of the contract, and proffers no basis (for example, the term of the contract) for the prediction of three years of additional business. I will discount the claim and award two years' worth of damages, not three, for a total of $480,000.

Additionally, as a result of Connors' conduct, Plaintiffs maintain that they suffered significant losses and reputational damage that may fairly be estimated to be at least the amount of lost BSN sales, $720,000 (or one additional contract at the same terms as with BSN). *Id.* ¶¶ 10, 12. At the time of these posts, Kramer was contacted by several otherwise potential customers. As a direct result of the posts, these companies would not do business with ThermoLife. According to Kramer, any one of these potential contracts would have been worth hundreds of thousands of dollars. ¶ 10. This evidence is far less specific than the BSN evidence, which was itself fairly general, and I find this amount to be speculative. I will not award this component of damages.

In addition to the false statements made in regard to ThermoLife's patent, Defendant stated that Kramer was involved in the Bay Area Laboratory Co-Operative ("BALCO") scandal, characterized as one of the biggest scandals in the history of professional sports. In 2003, BALCO distributed a performance-enhancing steroid that was not detectable at the time. Many professional athletes have been accused of using this steroid. Docket No. 11-1 at 5. While Kramer was not involved in the scandal, Kramer is consistently asked by dietary supplement companies as to his involvement with BALCO. As a result, Plaintiffs allege, companies have refused to do business with ThermoLife, citing Kramer's involvement with BALCO. Plaintiffs also maintain that Defendant is the only person who has consistently made such accusations on the internet. According to Plaintiffs, Connors also characterized Kramer online as a "rat" and stated that Kramer had "spent the last several years setting up his friends in the bodybuilding community." Compl. ¶ 17. Plaintiffs submit that all of these statements have caused reputational damage to ThermoLife and Kramer in an amount that cannot fairly be measured, but certainly is not less than $1,000,000.00. Kramer Decl. ¶ 19. Here, too, I find

12

the lack of specificity to be fatal. Simply saying that unnamed persons or companies, at unspecified times under unspecified circumstances, "have refused to do business with ThermoLife, citing ThermoLife's purported connection to BALCO," does not suffice. Given the nature of the statements, however, some loss to reputation may be presumed. I will award $50,000 on this component of the claimed damages.

In light of the foregoing, I will award a total of $530,000.00 in compensatory damages. I will not, however, award punitive damages, as I find that compensatory and injunctive relief is sufficient to remediate the repeated harm caused to Plaintiffs and to impress upon Defendant the gravity of the harm committed.

In closing, it is important to stress the following. It is in the nature of a default judgment that it concerns the rights between the parties only. In particular, this Defendant's failure to answer does not give rise to a more general judicial finding of fact as to, for example, the validity (or not) of Kramer's patent, a matter as to which I have not had the benefit of an adversarial presentation of the facts and law. Nor is this a general seal of approval as to Plaintiffs' version of the events; by its nature, it cannot be. This default judgment simply reflects a determination that this Defendant, by virtue of default, has refused to contest these allegations, and will be bound by that refusal.

## III. CONCLUSION

For the foregoing reasons, a default judgment will be entered in favor of Plaintiffs ThermoLife International, Inc. and Ron Kramer.

A written Order and Judgment will be entered separately.

Dated: March 17, 2014

_____
**KEVIN MCNULTY**
**United States District Judge**